IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JODY RENEE WATTS                                              PLAINTIFF

               v.                    Civil No. 09-2138

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                               DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Jody Watts, brings this action under 42 U.S.C. § 405(g), seeking judicial review

of a decision of the Commissioner of Social Security Administration (Commissioner) denying

her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI")

under Titles II and  XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there

is substantial evidence in the administrative record to support the Commissioner's decision. *See*

42 U.S.C. § 405(g)*.*

## I.      Procedural Background:

The plaintiff filed her applications for DIB and SSI on April 2, 2008, alleging an onset

date of November 1, 2007, due to bipolar disorder, anxiety, possible schizophrenia, attention

deficit disorder, coordination problems, headaches, hand and feet pain, and thyroid problems.

Tr. 177, 187-188, 212, 218-219.  Her applications were initially denied and that denial was

upheld upon reconsideration.  Tr. 59-62.  Plaintiff then made a request for a hearing by an

Administrative Law Judge (ALJ).  An administrative hearing was held on April 22, 2009.  Tr.

8-58.  Plaintiff was present and represented by counsel.

At this time, plaintiff was 31 years of age and possessed a high school education with a Bachelor's Degree in Criminal Justice. Tr. 12-13. She had past relevant work ("PRW") experience as hand packager, cafeteria food service worker, fitting room attendant, family support specialist, substitute teacher, cashier, and psychiatric aid. Tr. 14-26, 76-77, 178-179, 197-204.

On August 31, 2009, the ALJ found that plaintiff's personality disorder, attention deficit hyperactivity disorder ("ADHD"), and thyroid disorder were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 68. After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: "The claimant can perform work that is non-complex with simple instructions using little judgment. The work must be learned by routine and repetition with few variables and superficial contact incidental to work with the public and co-workers; the supervision required is concrete, direct, and specific. She cannot perform work in which emphasis is on fast, quick production." Tr. 70. With the assistance of a vocational expert, the ALJ found plaintiff could return to her PRW as a coupon hanger, auto detailer, and hotel maid. Tr. 77-78.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on October 14, 2009. Tr. 1-3. Subsequently, plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. ECF No. 11, 12.

AO72A
(Rev. 8/82)

II.   **Applicable Law**:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

3

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III.   **Evidence Presented:**

Records also indicate that Plaintiff had been diagnosed with depression, emotional lability and anger, congenital hypothyroidism, and coccygeal pain. Tr. 266-295, 397-523. She had been prescribed Lithium and Zoloft. Tr. 397, 399, 400.

In 1991, a psychological evaluation was requested after three years of academic difficulties. Tr. 301-305. Tests indicated that her overall intellectual skills fell within the lower limits of average. A significant difference existed between her verbal and nonverbal skills, with her nonverbal skills falling into the lower limits of borderline intellectual functioning. Her academic achievement as estimated from the WRAT-R was consistent with her verbal skills, and generally fell within the lower limits of the average range. However, there were deficits in her motor skills as observed on the nonverbal subtests and the Bender. These deficits were noted to also interfere with areas involving perceptual motor coordination, such as eye-hand

4

coordination and writing. Testing also revealed difficulties with recall and memory with both visual and auditory stimuli. This presented a significant problem for her as she tended to use a sight vocabulary method for reading and spelling, and had very immature phonic skills. Dr. Richard Murphy, Jr., concluded that Plaintiff would not qualify for primary educational handicapping condition because of the lack of deficit on her achievement tests, as measured by the WRAT-R. Her performance on the MAT-6 also suggested that her achievement was consistent with her overall level of intellectual functioning. Nonetheless, her performance in school was significantly discrepant from the performance expected from her intellectual abilities, especially her verbal resources. It was suspected that difficulties with memory and recall, as well as written expression were posing significant problems for her in demonstrating acquisition of information. Dr. Murphy recommended utilization of her verbal skills, as a method of assessing her knowledge. This method would be more reliable and would also allow her the opportunity to talk, which she really liked to do. Modification of assignments would also be helpful to her, limiting the amount of written assignments because of her difficulties with perceptual motor coordination. Tr. 301-305.

In December 1996, Plaintiff was admitted to Vista Health for two days following an altercation with her Dad and threats of suicide. Tr. 512-519. She alleged that her father was abusive and that she was no longer able to tolerate it anymore. Following an argument over the remote control, she overheard the family discussing the possibility that she had gone crazy. Plaintiff became angry. Her brother then took her to the ER. Plaintiff was diagnosed with adjustment disorder with disturbance of mood and conduct and assessed with a global assessment of functioning ("GAF") score of 30, with her highest for the year estimated at 60.

Testing revealed a moderate risk of suicide.  Her most prominent symptoms were noted to be paranoid ideation, poor anger control, and potential for verbal aggressiveness.  Tr. 512-519.

On February 17, 2006, Plaintiff resumed treatment at Western Arkansas Counseling and Guidance Center ("WACGC"). Tr. 336-339, 349-353.  She listed the following problems on her intake form: anger management, anxiety or panic, attention/concentration problems, childhood trauma, couple problems, depression, family conflict, impulse control, job related stress, losing touch with reality, low self-esteem, mania or hyperactivity, obsessive and/or compulsive traits, paranoia or suspicion, sleep disturbance, social discomfort, suicidal thoughts or attempts, and thinking problems.  Plaintiff reported obsessing over things, being manic, doing crazy things, problems with anger, and difficulty sleeping.  However, she listed taking medication, working cooperatively with others, following directions, being assertive, keeping appointments, and completing tasks assigned in her list of abilities.  Her number one request was for medication to stop her obsessions.  At the time of interview, she displayed a euphoric mood and appropriate affect.  Jillian Angell diagnosed Plaintiff with adjustment disorder and personality disorder not otherwise specified.  She concluded that Plaintiff's prognosis appeared to be good, as she was reasonably motivated for treatment.  Tr. 336-339.

On October 18, 2006, Plaintiff presented in the ER with complaints of buttock pain.  Tr. 296-297.  She had reportedly fallen at work two days earlier.  Plaintiff was having pain in the tail bone area that was interfering with her ability to work.  Although she did not like to take narcotics, she had taken two Lorcet she had at home.  Tenderness was noted over the coccygeal area with a negative straight leg raise test and normal range of motion over the hips bilaterally.  Cranial nerves were also intact with normal motor movement and no gross sensory impairment.

6

Dr. Moussa Yazbeck advised Plaintiff that their management of her pain would not change, even if x-rays were performed. She was diagnosed with coccygeal pain, placed on light duty, advised to use a donut to sit on, and advised to take Motrin for pain. Tr. 296-297.

On May 5, 2007, Plaintiff sought emergency treatment for depression. Tr. 298-299. She reported a lifelong history of depression, but stated that her symptoms had worsened over the previous few days. Plaintiff felt that she needed some medication. Her symptoms included anger and suicidal thoughts with no present plan. She also reported a history of hypothyroidism for which she had been prescribed Synthroid, but stated she could not afford it. An examination and lab tests were essentially normal, revealing only mild anemia. Plaintiff was diagnosed with hypothyroidism and suicidal ideations and prescribed Synthroid. Dr. Delilah Easom noted that Vista Health had been consulted and would arrive shortly. Dr. Yezbeck was to assume Plaintiff's care. Tr. 298-299.

On May 5, 2008, Plaintiff underwent a Mental Diagnostic Evaluation with Dr. Kathleen Kralik. Tr. 307-313. She complained of a short term memory and problems with stress. Plaintiff also reported a history of ADHD, complaining of inattentiveness and frequent response inaccuracy, slow occupational pace, and difficulties multitasking. In school, Plaintiff stated that she repeated kindergarten, was in special education classes for "brain coordination problems," and exhibited major coordination problems. By her account , Plaintiff did not get along well with her family. She referred to herself as the "black sheep," and reported receiving the "silent treatment" at family gatherings or reunions because she could not keep a steady job. Plaintiff had also threatened suicide several times over the years in the context of family fights. In fact, her parents had taken her daughter away from her several years earlier due to her psychological

7

problems.   Dr. Kralik noted that Plaintiff tended to externalize blame and did not take responsibility for her actions or contributions to problems.

Plaintiff was hospitalized at Harbor View in 1996 for two days, due to brief suicidal ideation.  She was stressed out secondary to work, college, a recent break-up with her boyfriend, and a fight with her parents.  Plaintiff stated that she had a "manic attack."  She was committed overnight another time by her parents, but continuation of the commitment was dismissed by the court when she was not found to be committable.  Plaintiff then received some treatment at WACGC from 1999 until 2000 and then again in 2001.  She alleges that her brother did not like her therapist there and "forced" her to go to Harbor View until her Medicaid ran out.  Plaintiff received additional services through WACGC in February 2006, but initially reported she stopped going when her Medicaid ran out.  She reported a tentative diagnosis of ADHD, but said she was never treated for this.  Plaintiff amended to say that she only went to one session because she felt the therapist was judging her, so she did not go back.  Regarding her response to medications, Plaintiff alleged to have been a zombie on Lexapro and giggled a lot on Trileptal. She stated that she had taken Lithium for "stress," but thought it did not work well with her thyroid condition.

Plaintiff presented as polite and cooperative.  However, she tended to go off on irrelevant tangents when making complaints over jobs.  Her style tended to reflect immaturity, dramatic personality tendencies, and a style of externalizing blame while lacking insight into her contributions to problems.  Plaintiff's mood was normal, her affect appropriate, and her thinking logical and organized.  She seemed fully oriented and was in touch with reality.  Dr. Kralik noted Plaintiff seemed to be of average intelligence.  ADHD could not be ruled out, as it was likely

AO72A
(Rev. 8/82)

positively mitigated by her intelligence in the academic setting.  Plaintiff was able to work, although she reported feeling readily overwhelmed.  In light of her immaturity and dramatic personality features, it was doubted she manifested intermittent and at times severe problems with affective and behavioral self-regulation.  It seemed more likely her lack of insight in identifying occupational positions more suitable to her motivation, interests, and needs was more problematic than any cognitive or mental disorder per se.  Dr. Kralik diagnosed Plaintiff with ADHD and personality disorder.  She estimated her current global assessment of functioning score to be 50-60, with 55-65 to be her highest for the year.  Although Plaintiff reported a history of symptoms similar to those associated with bipolar disorder, she denied having been diagnosed with bipolar disorder.  Dr. Kralik opined that her combined ADHD-like features and Cluster B personality issues with associated immaturity and externalizing tendencies would make psychotherapeutic treatment difficult.

As for Plaintiff's adaptive functioning, she was slow in performing activities of daily living, but capable of managing her own funds, driving, spending time with friends, checking her email, and watching television.  Her capacity to communicate and interact in a socially appropriate manner was estimated to be somewhat impaired, but generally adequate for occupational purposes.  Plaintiff's capacity to communicate in an intelligible and effective manner was generally adequate for occupational purposes, as was her capacity to cope with the typical mental/cognitive demands of work-like tasks.  Her ability to attend and sustain concentration on basic tasks seemed adequate for occupational purposes, but in occupational settings, had reportedly been intermittently and at times significantly impaired for occupational purposes.  Plaintiff's capacity to sustain persistence in completing tasks and capacity to complete

9

work-like tasks within an acceptable time frame seemed significantly impaired for occupational

purposes.  Dr. Kralik concluded that this seemed to be a valid and typical assessment of

Plaintiff's cognitive and mental functioning.  Her level of cooperation was adequate; however,

Dr. Kralik stated that malingering/exaggeration seemed likely in association with her immaturity

and dramatic personality features.  She noted that Plaintiff reported problems with bipolar

disorder on DDSSA paperwork, but specifically denied having been diagnosed with this, much

less the schizophrenia she also claimed to suffer from.  Tr. 307-313.

On May 16, 2008, Plaintiff returned to WACGC.  Tr. 340-345, 354-365, 374-379, 383-

389.  Plaintiff indicated that she was seeking help with impulse control, specifically getting mad

and walking away from a job.  She said she had lost her apartment and now had bad credit.  Her

suicidal ideations had decreased in frequency and she reported no recent suicide attempts.

Plaintiff's motor behavior seemed normal and responsive.  She did not show any signs of

distress. Her speech quantity and quality were both normal, her mood calm and cheerful, and her

affect appropriate.  Plaintiff's thought processes were logical and coherent and her judgment and

insight were good.  Karen Infield diagnosed Plaintiff with personality disorder and assessed her

with a GAF of 60-75.  Her prognosis was said to be fair, as her previous records showed

improvement and Plaintiff appeared to be highly motivated for treatment.  She indicated that

Plaintiff seemed to have some features of borderline personality disorder, which included

impulsivity (gambling and jobs), recurrent suicidal threats, reactivity of mood, and displays of

temper. Ms. Infield indicated that Plaintiff needed to work on anger management to increase her

ability to handle frustration on the job and reduce the amount of quitting and walking out on

10

jobs.  She also needed to work on her ability to handle stressors without threats of suicide and to completely stop gambling.  Tr. 340-345.

On May 30, 2008, Plaintiff was in a good mood.  Tr. 346-347, 380-381.  She was assessed for pathological gambling and admitted to having all ten of the symptoms, only five of which were required for diagnosis.  Plaintiff indicated that gambling had been a problem for two to three years.  In 2007, she had gambled away half of her income.  At present, she had not gambled in three weeks.  Plaintiff wanted to attend Gamblers Anonymous meetings, but the class was near the casino, and she did not trust herself.  Anger had also been a problem for her over the previous week.  She reported disagreements with her parents and a friend.  Plaintiff was also bored with her job at Papa John's.  Ms. Infield noted that Plaintiff might be working at a job that was below her capabilities, but it seemed she allowed her temper to limit her choices.  Plaintiff had a slight speech impediment, which could lead people to think she was intellectually "slow."  Ms. Infield asked Plaintiff to call Ms. Kralik and obtain her official IQ scores, as this would help with her treatment.  Tr. 346-347.

On June 6, 2008, Plaintiff indicated that Ms. Kralik's office stated that no formal IQ testing was performed.  Tr. 348, 382.  She signed a release to allow Ms. Infield to obtain the results of whatever psychological and intellectual testing had been performed by the Administration.  Ms. Infield advised Plaintiff about the Anger Management Group, but due to finances, Plaintiff stated she would have to wait until July to attend.  Plaintiff indicated that she had not gambled in four weeks.  She thought her priorities were in better order.  She was in a good mood and said that counseling mainly helped her by talking to someone outside of her family and friends–i.e., someone objective.   Tr. 348.

11

On June 25, 2008, Plaintiff returned for a thyroid and sugar re-check.  Tr. 368-369, 537-539.  Plaintiff had a strong family history of diabetes, and stated that she became weak if she did not eat.  Plaintiff did not have gestational diabetes, but did have a history of anemia.  She had been feeling tired, although she slept well, but her mood was not good.  Plaintiff complained of mood swings and anxiety, causing her to "flip out."  Her therapist had reportedly diagnosed her with personality disorder, and Plaintiff had tried Zoloft, Trileptal, Zyprexa, Lexapro, and Lithium.  She wanted to get a diagnosis from her therapist before starting a new medication.  Therefore, Dr. Saunders prescribed FeSo4 and Thyroid medication.  Tr. 368-369.

On June 27, 2008, Plaintiff was angry because her food stamps had been delayed.  Tr. 414.  She told the man at the food stamp office that she was going to kill herself and then hung up on him.  Plaintiff indicated that she knew this was stupid.  She really was not planning to kill herself, she was just angry.  Plaintiff had also been hurt by several things her daughter had said to her during their vacation.  Ms. Infield encouraged her not to take these statements personally, as kids often did not know what they were saying.  Tr. 414.

On July 11, 2008, Plaintiff thought more about a fight she had with her parents while on vacation.  Tr. 415.  She determined that she had gotten too hungry and became very irritable.  Ms. Infield discussed alternatives to yelling.  Plaintiff admitted that she knew her current behavior was over reacting.  Tr. 415.

On July 25, 2008, Plaintiff was worried about her elderly Aunt who was falling and needed to be placed in assisted living.  Tr. 416.  She was also worried about her neighbor who had three children in a filthy house.  It was noted that competent people were aware of these

12

situations and that there was nothing Plaintiff could do to help.  Ms. Infield recommended that she stop worrying.  Tr. 416.

On September 29, 2008, Plaintiff returned for a follow-up concerning her thyroid.  Tr. 534-536.  She was experiencing some problems with her feet and anxiety, although her foot pain had improved with the purchase of new shoes.  An examination revealed some continued plantar surface tenderness.  Plaintiff stated that she did not like her current counselor at WACGC.  She was prescribed Zoloft for depression, and it was noted that she was working part-time.  Tr. 534-536.

On January 1, 2009, Plaintiff complained of a burning sensation in the left forearm with tingling and a cold sensation in  her left hand.  Tr. 524-532.  She reported some indigestion symptoms earlier in the day, and indicated that her father suffered from heart disease.  However, an EKG was normal.  Plaintiff was diagnosed with exertional forearm muscle pain and anxiety.  Tr. 524-532.

On April 9, 2009, Dr. Patricia Walz conducted a mental diagnostic evaluation of Plaintiff.  Tr. 541-551.  Plaintiff stated that she had applied for disability because others had encouraged her to do so and because she had a degree in Criminal Justice but had been unable to use it.  She indicated that she performed some part-time jobs, but had problems with anger issues and getting along with others.  Plaintiff also reported coordination problems and a slow pace.  Currently, Plaintiff was experiencing stress.  She admitted to suicidal ideation a month prior, stating that one month earlier she had been ready to take "19 pills", but decided to put it off one day and had been in a good mood since.  Plaintiff also claimed to be a cutter, confessing that she did it when she was really down or when she was bored.

13

Plaintiff's MMPI results were consistent with a "psychotic valley" often seen in people with significant psychological illness, which was usually chronic in nature and debilitating. Dr Walz indicated that people with this type of profile were often diagnosed with schizophrenia or schizoaffective disorder. Intellectual functioning was thought to be in the low average range. Although she did appear quite moody, Plaintiff was not diagnosed with bipolar disorder. Instead, Dr. Walz diagnosed her with dysthymia and borderline personality disorder, noting her significant depression and suicidal behavior. She also believed Plaintiff's reports of bizarre sensory experiences were suggestive of schizotypal personality disorder. Dr. Walz estimated Plaintiff's GAF to be 40-45. Tr. 541-551.

Dr. Walz indicated that Plaintiff's social skills were significantly impaired, as she felt others were inconveniencing her on purpose. She also described a fantasy about kidnaping her boyfriend's son to get back at him for not leaving his wife for her, which was bizarre and suggestive of extremely poor judgment. However, her speech was clear and intelligible. She persisted well, and her IQ fell within the low average range. Accordingly, Dr. Walz concluded Plaintiff had marked limitations in the area of making judgments on simple work-related decisions, making judgments on complex work-related decisions, interacting appropriately with the public, interacting appropriately with supervisors, and interacting appropriately with co-workers. Tr. 541-551.

On May 6, 2009, Plaintiff was admitted to PsycHealth after presenting in the ER endorsing thoughts of suicide. Tr. 554-560. The screening form indicated she had been extremely manic for two weeks. She was not being followed on an outpatient basis, but carried a diagnosis of personality disorder. Plaintiff stated, "I want to be diagnosed for Disability."

14

Drug testing was positive for Benzodiazepines, and Plaintiff requested medication.  However, she endorsed an improved mood following admission.  She was cooperative with the interview, her affect was appropriate, her speech of normal rate and tone, and her psychomotor activity normal.  Her thought processes were goal-directed and she did not endorse auditory/visual hallucinations or delusions.  No suicidal/homicidal/assaultive ideations or intent were reported at the time of the interview.  Plaintiff's judgment and insight were said to be fair and her intelligence average.  Dr. Brent Oldham diagnosed her with mood disorder rule out bipolar disorder.  Initially, Plaintiff's behavior was inappropriate and she appeared to be attention seeking.  However, on May 12, she began interacting appropriately, was friendly, and cooperative.  With the addition of Lamictal, her mood improved and she was felt to have met her maximum medical benefit on May 13 and was discharged home.  At this time, her GAF was estimated at 45.  Tr. 554-560.

IV.   **Discussion:**

Plaintiff contends that the ALJ erred in concluding that her reports concerning her subjective complaints were not credible, concluding that she was malingering and discounting her MMPI, determining that she was non-compliant with medication and treatment due to a gambling addiction, and determining Plaintiff's RFC.

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th

15

Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

In the present case, Plaintiff has been diagnosed with depression, dysthymia, anxiety, personality disorder, ADHD, and adjustment disorder. We note, however, that she has failed to seek out consistent mental health treatment during the relevant time period. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). She was treated in the ER in 2007 for depression, but did not seek further treatment until May 2008, when

16

she returned to WACGC for counseling.[1]  Tr. 298-299, 340-345.  Plaintiff attended only five

counseling sessions in 2008.  Tr. 346-347, 348, 414, 415, 416.  In September 2008, she indicated

that she did not like her counselor, and no further appointments were scheduled.

Records do indicate that Plaintiff was attending monthly support group meetings through

NAMI and the Depressed, Bipolar Support Alliance ("DBSA").  It does not, however, appear

that these groups were led by mental health or even medical professionals.  Jack Baker, the

facilitation for NAMI testified that Plaintiff had been involved with the program for

approximately three years.  Tr. 47-53.  He testified to having undergone a three-day training

session on how to be a facilitator, but no formal mental health training.  The ALJ correctly noted

that Mr. Baker was not a mental health practitioner and, as such, was not an acceptable medical

source.  According to Social Security regulations, there are three major distinctions between

acceptable medical sources and the others: (1) Only acceptable medical sources can provide

evidence to establish the existence of a medically determinable impairment, (2) only acceptable

medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)

(2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R.

§§ 404.1527(d) and 416.927(d) (2007).

Likewise, while it is commendable that Plaintiff is involved in both of these groups, the

fact that they are not monitored or overseen by mental health professionals makes it impossible

to say her involvement in these programs constituted mental health treatment.   It appears that

both were merely support groups made up of a facilitator and individuals in need of support.  No

---

[1]According to her testimony, Plaintiff had participated in treatment at WACGC prior to her alleged
onset date.

17

evaluations were conducted, diagnoses made, medications prescribed, or individual therapy offered as a part of the regimen.

Although Plaintiff alleges to have been hospitalized at least twice prior to her alleged onset date, she was hospitalized only once during the relevant time period.  In 2009, she was admitted to PsycHealth for suicidal ideation.  Tr. 554-560.  She indicated she was not currently involved in any outpatient treatment and requested medication.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating plaintiff's allegations of disability due to a mental impairment).  Interestingly, upon admission, Plaintiff stated that she wanted to be diagnosed "for Disability."  It was noted that her initial behavior appeared to be attention seeking.  However, shortly after admission, Plaintiff indicated that her mood had improved.  Her behavior also improved and Plaintiff was discharged home after only seven days of inpatient treatment.  Tr. 554-560.  It seems clear Plaintiff sought out this treatment in an attempt to help her disability case.

The evidence does indicate that Plaintiff often reported suicidal ideation, but it also reveals that she was immature and experienced problems with anger management.  It seems she tended to over react to situations and would then threaten to kill herself in a fit of anger.  Ms. Infield even noted that Plaintiff had problems with anger management that caused her to walk out on jobs.  In spite of her anger and threats, however, the record is devoid of any evidence to indicate that Plaintiff ever actually attempted suicide or that she maintained a suicidal plan.  In fact, none of her treating doctors/therapists ever concluded that Plaintiff was mentally disabled. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's

18

conservative treatment was inconsistent with plaintiff's allegations of disabling pain).  And, records consistently indicate Plaintiff continued to work part-time.

Plaintiff did undergo two psychological evaluations during the relevant time period.  Both Drs. Kralik and Walz examined Plaintiff.  Dr. Walz concluded Plaintiff had marked limitations in the areas of making judgments on simple work-related decisions, making judgments on complex work-related decisions, interacting appropriately with the public, interacting appropriately with supervisors, and interacting appropriately with co-workers.  Tr. 541-551. However, after reviewing the evidence of record, we find Dr. Walz's opinion to be inconsistent with the remaining medical evidence.  Plaintiff reported the ability to follow directions, work cooperatively with others, use self-help materials, maintain consistent behavior, be assertive, provide leadership, resolve conflicts, keep appointments, complete tasks assigned, express thoughts and feelings, and develop solutions to problems.   Tr. 341.   All examining doctors/counselors also found her to be in touch with reality and to be logical and coherent. Further, Dr. Kralik concluded that Plaintiff's capacity to communicate and interact in a socially appropriate manner was somewhat impaired, but generally adequate for occupational purposes. Her capacity to communicate in an intelligible and effective manner was generally adequate for occupational purposes, as was her capacity to cope with the typical mental/cognitive demands of work-like tasks.  Plaintiff's ability to attend and sustain concentration on basic tasks seemed adequate for occupational purposes, but in occupational settings, had reportedly been intermittently and at times significantly impaired for occupational purposes.  Her capacity to sustain persistence in completing tasks and capacity to complete work-like tasks within an acceptable time frame seemed significantly impaired for occupational purposes.  It seemed to Dr.

Kralik that Plaintiff's lack of insight in identifying occupational positions more suitable to her motivation, interests, and needs was more problematic than any cognitive or mental disorder she suffered from. She also felt that malingering/exaggeration was likely in association with Plaintiff's immaturity and dramatic personality features.[2] Thus, while it is clear that Plaintiff had some mental limitations, it does not appear these limitations prevented her from performing all work-related activities.

Plaintiff was also diagnosed with thyroid problems and prescribed Synthroid. She did not, however, take her medication as prescribed. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."). Although Plaintiff claimed to be unable to obtain her medication due to financial constraints, we note that she did not seek out assistance through a prescription drug assistance program or other program established to help individuals who are unable to afford medication and medical treatment. *See Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan,* 892 F.2d 747, 750 n. 2 (8th Cir. 1989) (noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted). In fact, Plaintiff had been diagnosed as a pathological gambler and was undergoing recovery. She gambled away

---

[2]Although the ALJ does mention Dr. Kralik's conclusion that Plaintiff was malingering/exaggerating, we can find no over reliance on this. Further, this does not appear to be the basis for her determination that Plaintiff was not disabled.

half of her income in 2007.  As such, her failure to take her medication as prescribed is not excused.

Plaintiff's activities of daily living also undermine her claim of disability.  Plaintiff reported that her daily activities included working part-time, working number puzzles, watching television, going for short walks, visiting friends, going to the library, and cleaning house.  Tr. 189.  She stated that she could care for her personal hygiene, prepare meals daily, clean the house, wash the laundry, perform household repairs, iron, mow, go outside daily, drive a car, shop for groceries and personal items in stores, pay bills, count change, handle a savings account, use a checkbook/money orders, solve sudoku puzzles, read, watch television, visit friends, go to the mall and library, and attend NAMI meetings.  Tr. 190-193, 221-224.  Plaintiff indicated that she did not follow written instructions well, had difficulty understanding oral instructions, experienced difficulty getting along with some authority figures and co-workers, did not handle stress well, and had a fair ability to handle changes in routine.  Tr. 194-195.  However, she later reported the ability to follow directions, work cooperatively with others, use self-help materials, maintain consistent behavior, be assertive, provide leadership, resolve conflicts, keep appointments, complete tasks assigned, express thoughts and feelings, and develop solutions to problems.  Tr. 341.  Plaintiff indicated that she was also involved with both NAMI and DBSA. Tr. 547.  In fact, she was elected President of DBSA.  Plaintiff stated that she was very involved with the other members of DBSA and often went out to eat, hung out, or went to movies.  Tr. 547.  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*,

21

72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

Perhaps the most damaging, however, is the fact that Plaintiff continued to work, albeit part-time, after her alleged onset date. As late as 2008, Plaintiff was working part-time at Kohl's. Tr. 307. Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. *See See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did. We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity."); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir. 2001). We can find no evidence of deterioration in Plaintiff's condition. Therefore, even though this work may not constitute substantial gainful activity, it does evidence her ability to perform some work-related activities.

We must also review the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir.

2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, the RFC assessments of two consultative psychological examiners, and the RFC assessment of one non-examining consultant.  On May 19, 2008, Dr. Jerry Henderson reviewed Plaintiff's medical records and completed a psychiatric review technique form and a mental RFC assessment.  Tr. 317-334.  Based solely on her medical records, he diagnosed Plaintiff with ADHD and personality disorder not otherwise specified.  Dr. Henderson concluded that Plaintiff had mild limitations with regard to activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, and pace.  He also determined Plaintiff was moderately limited with regard to understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted them; completing a normal workday and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work

23

place; setting realistic goals; and, making plans independently of others. No episodes of decompensation were noted. Dr. Henderson stated that Plaintiff had the capacity to perform unskilled work in which a strong emphasis was not placed on rate of production. Tr. 317-334. This was affirmed by Dr. Jan Rankin on August 8, 2008. Tr. 392.

While we note Dr. Walz's much more restrictive RFC assessment, we agree with the ALJ's conclusion that it is not supported by the overall record. Tr. 541-551. This opinion seems to be based more on the profile generated by Plaintiff's MMPI scores than an actual evaluation of her true abilities and limitations. Dr. Walz's assessment is simply not supported by substantial evidence of record.

While we do believe Plaintiff suffers from some mental limitations, she has given very conflicting reports concerning her abilities. By her own reports, she is very active in mental health support groups, having been elected President of at least one. Plaintiff is also active with friends and family, lives alone, continues to work part-time, and can care for her own personal needs. Further, she has indicated that she sought out disability because she could not find a job in the Criminal Justice field and others felt she should apply. However, the Agency will not consider a claimant disabled merely due to the lack of work, the inability to find work, the unwillingness to perform a particular type of work, or the hiring practices of employers. *See* 20 C.F.R. §§ 404.1566(c), 416.966(c). We can find no evidence to suggest Plaintiff's mental impairments prevent her from performing all work-related activities.

We note that in 2008, Dr. Kralik examined Plaintiff and diagnosed her with ADHD and personality disorder. She estimated her current GAF score to be 50-60, with 55-65 to be her highest for the year. Dr. Kralik stated that malingering/exaggeration seemed likely due to her

24

immaturity and dramatic personality features.  Plaintiff was noted to externalize blame, not accepting responsibility for her own behavior.  Dr. Kralik indicated that Plaintiff's allegation of being too disabled to work contrasted significantly with her academic and occupational history, especially in the absence of any intervening factor to explain why she was able to pull double shifts as a psychiatric aide in an inpatient setting but now was allegedly able to work only 15 hours per week in retail.  Therefore, given Plaintiff's failure to seek out consistent treatment for her alleged mental impairments, ability to socialize with friends and family members, and ability to continue to work part-time, we find that the ALJ did not err in concluding that Dr. Walz's opinion was not entitled to significant weight.

Accordingly, we find substantial evidence to support the ALJ's conclusion that Plaintiff could perform work that is non-complex with simple instructions; uses little judgment, is learned by routine and repetition with few variables and superficial contact incidental to work with the public and co-workers; requires concrete, direct, and specific  supervision; and does not place an emphasis on fast, quick production.

We next evaluate the testimony of the vocational expert.  Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

25

The vocational expert testified that someone of Plaintiff's age, education, and PRW who could perform work that is non-complex with simple instructions using little judgment, involves tasks that are learned by routine and repetition with few variables, requires only superficial contact incidental to work with the public and co-workers, requires concrete, direct, and specific supervision, and does not involve fast, quick production, can still perform work as a coupon hanger, automotive detailer, and hotel/motel maid.  Tr. 53-557  Given that this RFC assessment takes into account the impairments the ALJ found to be substantially supported by the record, the ALJ's decision will stand.

**V.**    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 4th day of November 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

26